# EXHIBIT "A"

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 2 of 30

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

JAYSON RAMIREZ,

                             Plaintiff,

      — against —

CITY OF NEW YORK and JOHN DOES 1-10

                          Defendants.

Index No. _____

SUMMONS

JURY TRIAL DEMANDED

        To the above-named Defendants: You are hereby summoned to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.  The basis of venue is the location where the claims arose.

TO:

THE CITY OF NEW YORK
New York City Law Department
100 Church Street New York,
New York 10007

Dated:  New York, New York
       August 19, 2021

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 3 of 30

WERTHEIMER LLC


By:_____

Joel A.  Wertheimer
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

JAYSON RAMIREZ,

                                    Plaintiff,

            — against —

CITY OF NEW YORK and JOHN DOES 1-10

                                    Defendants.

Index No. _____

COMPLAINT

JURY TRIAL DEMANDED

### PRELIMINARY STATEMENT

1.      Plaintiff Jayson Ramirez was attacked and arrested by more than five John Doe New York Police Department ("NYPD") police officers for filming their assault on two New Yorkers leaving a protest.

2.      The assault and arrest were part of the NYPD's policy and practice of retaliating against any citizen who exercised their First Amendment to object to police violence.

3.      The NYPD and its officers arrested and assaulted citizens capturing their police violence in the summer of 2020 to silence speech directed against police violence.

4.      The police were not violent towards similarly situated protestors and citizens documenting so-called "Blue Lives Matter" protests or anti-COVID mask protests.

5.      Mr. Ramirez suffered physical injuries from the beating he sustained from the police, was arrested on bogus charges of breaking curfew while standing on private property, and has lasting emotional damage.

3

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 5 of 30

6.      In fact, he moved out of New York as a result of the emotional

damage he suffered, and found being around the NYPD consistently emotionally

damaging.

7.      Mr. Ramirez brings this suit to right those wrongs.

## PARTIES

8.      Plaintiff Jayson Ramirez is a resident of North Carolina.  At the

time of the incident, he was a resident of the Bronx, New York.

9.      Defendant City of New York is a municipal corporation in the State

of New York.

10.     Defendants John Doe 1-10 are officers in the New York City Police

Department acting under color of state law.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to general

jurisdiction under the New York State Constitution.

## VENUE

12.     Venue is proper under CPLR § 503(a) because a substantial part of

the events giving rise to the claim occurred in Bronx County, New York.

## FACTS

13.     On May 28, 2020, days after George Floyd's death, protests began

across New York City.  One protest in Union Square saw a mobilization of hundreds of

NYPD officers in response who made several arrests. A group of protestors marched to

City Hall where officers kettled them with bicycles, and arrested approximately 75 people.

14. Protests continued on May 29th at Foley Square and Barclays Center. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons.

15. On June 1, 2020, in the midst of the protests in New York City, then-Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m. to 5:00 a.m. curfew.

16. On the evening of June 1, 2020, de Blasio announced he would be extending the curfew to the evening of June 2, 2020.

17. On June 2, 2020, de Blasio issued Emergency Executive Order No. 119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which "no persons or vehicles" could "be in public."

18. Under the Curfew Orders: "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

19. Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

20. NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure

established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

21.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

22.     On June 1st, the NYPD Operations Division issued a FINEST message regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." (emphasis added).

23.     On June 3rd, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."

24.     On June 4th, protests continued across the City, and, in a marked escalation, police made more arrests than the day before.

25.     In an attack on action against, among other things, police misconduct in the Bronx, police in the Mott Haven neighborhood blocked all exits of a protest group on 136th Street *before* 8:00 p.m., prevented protesters from leaving, and then effectuated mass arrests with heavy use of force for purported violations of the Curfew Orders when the time passed 8:00 p.m., including striking protesters with

6

batons, deploying pepper spray, and arresting National Lawyers Guild – New York City Chapter Legal Observers, and medical volunteers along with them.

26.     As documented extensively by Human Rights Watch and others, the NYPD arrested observers and those documenting the police violence during the protests as a matter of policy.

27.     The New York City Department of Investigation ("DOI") found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to First Amendment expression.

28.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

29.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed the latter during the 2020 protests.

30.     Human Rights Watch documented at least 61 cases of protesters, legal observers, and bystanders who sustained injuries during the crackdown, including lacerations, a broken nose, lost tooth, sprained shoulder, broken finger, black eyes, and potential nerve damage due to overly tight zip ties.

31.     At least 13 legal observers – who wear clearly identifiable hats and badges – were also detained, in some cases violently, before being released. Video footage captures an official from the NYPD's Legal Bureau instructing other officers: "Legal Observers *can* be arrested.… They are good to go!"

7

32.     The NYPD's highest-ranking uniformed officer, Chief of Department Terence Monahan, was present during the action, along with at least 24 other uniformed supervisory officers – chiefs, lieutenants, captains, or inspectors in white shirts.

33.     The NYPD engaged in a policy of First Amendment retaliation and suppression in order to chill and quell speech.

34.     The NYPD response to the protests in New York City in May and June 2020 was in line with its history of violent and unconstitutional responses to those as other past protests in New York City, including its treatment of First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

35.     For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray and batons strikes to disperse, and "kettling" to move protestors from specific locations to effectuate mass arrests.

36.     The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests.

37.     The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.

8

38.     Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Laywers Guild – New York City Chapter Legal Observers, as well as "kettling" tactics to move protestors or initiate mass arrests.

39.     Additionally, the NYPD have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

40.     Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrests and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiff in this case.

41.     Indeed, in Plaintiff's case, the NYPD employed tactics developed and modified over the course of many years by the NYPD and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

     a.    *Mandal v. City of New York.,* 02 Civ. 1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 02 Civ. 6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on

9

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 11 of 30

plaintiffs' Fourteenth Amendment Equal Protection and First Amendment- based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.      *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Chief Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

c.      *Haus v. City of New York,* 03 Civ. 4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04 Civ. 0665 (RWS) (S.D.N.Y.);

d.      *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest. Defendant City of New York settled this litigation with payment in excess of $2,000,000;

e.      *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05 Civ. 8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04 Civ. 7921 (RJS)(JCS)

(S.D.N.Y.), *Kyne v. Wolfowitz*, 06 Civ. 2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04 Civ. 7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor theinfraction, rather than issuing summonses on the street"); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04 Civ. 7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (grating plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

f.       *Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

g.       *Osterhoudt v. City of New York, et al.*, No. 10 Civ. 3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

h.       Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and

responsible,"25 there were more than sixty civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14 Civ. 5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listed by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco*, 15-cv-7280 (S.D.N.Y.);

i.      Others have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT); *(Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

j.      The plaintiffs in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F Supp 3d 372 (SDNY 2017) ("*Case I*"); 408 F.Supp.3d 313 (SDNY 2019) ("*Case II*");

k.      Those cases, and several of the OWS-related cases referred to above, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

l.      The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

m.      *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.*, First Amended Complaint at Paragraph 415).

### The NYPD's Failure to Train

42.     Since at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

43.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

44.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

45.     Upon information and belief, to this day, that document forms the core of today's NYPD protest response-related training.

46.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, such as disorder control formations and making mass arrests.

47.     Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

48.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

49.     For example, upon information and belief, there is virtually no NYPD training— and certainly no *meaningful* NYPD training—focusing on how to

utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like. Although the above, and related, problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

50.     The SRG, deployed around the City at protests in 2020 was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

51.     The SRG has a unit in each of the five boroughs and the Disorder Control Unit has now been incorporated into the SRG.

52.     In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations.  They'll have no role in protests.  Their response is single-fold.  They'll be doing counter-terror work.  They'll be assigned to different posts throughout the city."

53.     However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

14

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 16 of 30

54.     Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, among other places, by CCRB complaints, and in numerous lawsuits.

55.     SRG members are meant to have additional DCU training.

56.     Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

57.     However, many of the officers deployed to respond to the protests in 2020, did not even receive *that* training, which was supposedly required of them.

58.     As a result, as a report by the Corporation Counsel for the City of New York ("OCC Report") noted, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."

59.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 17 of 30

60.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

61.     For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03 Civ. 2829 (KMW) (GWG) (SDNY).

62.     Those reports praise employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

63.     After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC- related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 18 of 30

64.     For example, according to the Corporation Counsel's report, NYPD

records do not show any protest-related after-action reviews undertaken between the

2004 Republican National Convention and until the events of the George Floyd protests.

65.     Nevertheless, upon information and belief, at all times relevant

herein, City policymakers routinely received reports regarding arrests made in

connection with perceived First Amendment assemblies, including through internal

reports such as Unusual Occurrence Reports; Mass Arrest Reports including data

tracking arrestees, the length of time it took them to go through the system, whether

they were released with a summons or DAT, their proposed arrest charges, and other

information related to the involved in mass arrests related to police actions taken in

relation to an event; and/or other reports including information arrests, use of force

protest arrest processing, and/or related prosecutions.

66.     Despite the wealth of evidence of NYPD members' historical

brutality against protesters, Defendant City has ignored, and/or failed to utilize,

relevant information, including information gleaned from reports and lawsuits, as well

as other data points, to identify deficiencies in NYPD training as it relates to

constitutionally compliant protest policing

67.     For example, in a deposition in *Packard v. City of New York,* 15-cv-

7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training

it did not review: (i) decline to prosecute decisions, (ii) conviction conversion rates or

(iii) allegations and settlements in lawsuits relating to protest.

68.     As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

69.     For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or training.

70.     Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."

71.     Mayor de Blasio directed the DOI and the Corporation Counsel to produce the DOI and Corporation Counsel reports referred to herein.

72.     While both City agencies made reports and recommendations that include what may be characterized as critiques of some NYPD protest-related training, neither the DOI nor the Corporation Counsel, nor any other City agency, has released the contents of that training – despite that much of its core contents are already publicly available, including on the public docket in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM).

73.     At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let

alone how to encourage or facilitate protests - despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years – demonstrates both a history, and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

74.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn.  The march was attended by counter protestors organized against police brutality.  Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality.  By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.

75.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo.  The protestors set fires in the street and threw masks into the flames.  They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest.  An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks.  Police said that no arrests or summons were issued to the protestors on the night of the rally.

### Police Assault and Arrest Plaintiff Jayson Ramirez

76.     Jayson Ramirez lived in the vicinity of Mott Haven at the time of the protests.

19

77.     At some point shortly after 8:00 p.m. he and others from his apartment building observed the NYPD harassing two citizens who were complying with their dispersal orders.

78.     Mr. Ramirez was outside on private property and began filming the incident.

79.     Mr. Ramirez can be heard on film yelling at the officers for being violent with one of the protestors who was a woman.

80.     Mr. Ramirez can also be heard telling the citizens not to resist.

81.     The officers then come towards Mr. Ramirez in retaliation for having the temerity to film them violating the rights of other New Yorkers.

82.     Mr. Ramirez was on private property when the officers came towards him.

83.     On video, Mr. Ramirez can be seen backing up as the officers come towards him.

84.     The officers then violently detain Mr. Ramirez, who was not breaking any law, as he was not "in public" during the curfew.

85.     Further, Mr. Ramirez was not given any dispersal order by the officers.

86.     Moreover, even if he had been given a dispersal order by the officers, he was moving backwards into his apartment complex at the time the officers arrested him.

87.     The officers proceeded to violently arrest Mr. Ramirez.

88.   First, he was pushed aggressively by the officers.

89.   Then he was thrown down to the ground aggressively.

90.   While on the ground he was kicked, punched, and hit with batons.

91.   Officers can be seen on video punching Mr. Ramirez while he is

detained on the ground:





92.   During this time, one officer hit Mr. Ramirez in the stomach with

the end point of his baton, while the other officers were beating Mr. Ramirez all over his

body.

21

93.     Mr. Ramirez was forced onto his knees, with one officer crouching on Mr. Ramirez's knee, and another officer hitting him repeatedly with fists.

94.     While Mr. Ramirez was being beaten, the other officers were trying to disperse onlookers who had stopped to watch what was happening.

95.     At one point, Mr. Ramirez's slippers came off, and he was left barefoot.

96.     Mr. Ramirez then was detained with heavy-duty zip ties, and his wrists were tied very tightly together.

97.     He could not feel his wrists for an hour and a half afterwards.

98.     Once detained, Mr. Ramirez was dragged, still barefoot, to a police van.

99.     He was brought to the precinct and issued a summons for violating the curfew.

100.    That summons was dismissed.

101.    Mr. Ramirez had significant bruising and scraping from the incident and went to the hospital for his injuries.

102.    Mr. Ramirez also suffered emotionally from the attack, leaving him fearful of living in his neighborhood in the Bronx.

103.    He ultimately moved to North Carolina as a result of the attack.

22

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to New York State Law and 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights the Fourth and Fourteenth Amendments to the United States Constitution*

104.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

105.    Defendants had no judicial warrant authorizing then to seize Plaintiff.

106.    Defendants seized Plaintiff, restricting their freedom of movement, without privilege or lawful justification.

107.    Plaintiff was conscious of his confinement by Defendants.

108.    Plaintiff did not consent to his confinement by Defendants.

109.    It was unreasonable for Defendants to believe that they had lawful cause to seize, detain, or arrest Plaintiff.

110.    Thus, Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

111.    Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of their persons and/or property.

112.    Defendants seized Plaintiff based on the perception that he was part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff based on his own, individual conduct, as opposed to the perceived "group conduct."

113.    Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

114.    With respect to Mayor de Blasio's Curfew Orders, the plain language of the Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

115.    Plaintiff was arrested on private property, and was not "in public" on the night of the arrest.

116.    Plaintiff was also arrested without first ensuring that he had been given dispersal orders, meaningful opportunities to disperse, and refused to comply.

117.    That enforcement was consistent with official NYPD policy.

118.    For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch35, DCLM Hart stated that officers who merely "observed individuals who were not essential workers in public...[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

119.    As a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to unreasonably long, onerous, punitive arrest

processing, as well as obviously hazardous conditions of confinement given the

COVID-19 pandemic.

      **120.**     As a result of Defendants' acts and omissions, Defendants deprived

Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury,

pain, suffering, psychological and/or emotional injury, and/or humiliation; caused

Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Excessive Force/Assault and Battery**
*Under New York State Law and pursuant to 42 U.S.C. § 1983 for Defendants'*
*Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the*
*United States Constitution*

      **121.**     Plaintiff incorporates by reference the allegations set forth in all

preceding and following paragraphs as if fully set forth herein.

      **122.**     Defendants used force against Plaintiff that was unjustified and

objectively unreasonable, taking into consideration the facts and circumstances that

confronted Defendants.

      **123.**     The types and levels of force Defendants used against Plaintiff were

unjustified and objectively unreasonable, taking into consideration the facts and

circumstances that confronted Defendants.

      **124.**     The City of New York failed to investigate incidents of which they

were aware or should have been aware in which NYPD members used excessive force

against Plaintiff and other protesters.

      **125.**     The City of New York failed to discipline NYPD members who

used excessive force against Plaintiff and other protesters.

25

126.     Plaintiff and others arrested at the protests were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

127.     Plaintiff and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

128.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

### THIRD CLAIM FOR RELIEF

**First Amendment Infringements, Including First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

129.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

130.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff and engaging in the acts and omissions complained of herein.

131.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

132.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

133.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff and others from engaging in similar protected conduct in the future.

134.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of the First Amendment rights.

135.    Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims – including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline - with malice.

136.    Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims in response to the perceived viewpoint and/or message expressed by Plaintiff.

137.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

Case 1:21-cv-07835-VSB   Document 1-1   Filed 09/20/21   Page 29 of 30

138.    Additionally, the offenses charged against Plaintiff which Defendants might argue provided probable cause for Plaintiff's arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

139.    Plaintiff suffered actual chill in that he was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

### FOURTH CLAIM FOR RELIEF
**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

140.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

141.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to

train, supervise, and discipline NYPD officers, despite full knowledge of the officers'

wrongful acts, as described herein.

PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests

judgment against Defendants as follows:

1. awarding compensatory damages against the Defendants;

2. awarding punitive damages in an amount to be determined at trial;

4. awarding Plaintiff reasonable attorneys' fees and costs under applicable

law; and

5. directing such other and further relief as the Court may deem just and

proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  New York, New York
       August 19, 2021

WERTHEIMER LLC

By:_____
Joel A. Wertheimer
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com